# *Lessee of Thomas M'Laughlin *against* [*534 John Maybury, jun.

The party applying for a new trial must have merits; and the opinion of the judge who tried the cause, will always have great weight.

One cannot be an actual settler on two tracts of land, but his children if of sufficient age to reside on and cultivate the land may be settlers.

Indulgence will be given to a settler, who quits his residence for a temporary purpose with intention of returning to it.

The title of the settler does not depend on the extent of his improvements, but on the *animo residendi*, and the possession continued.

APPEAL from the decision of the Circuit Court of Mercer county.

The plaintiff claimed as an actual settler, under the act of 3d April 1792, 400 acres west of the river Allegheny. The cause was first tried before YEATES, Justice, on the 2d October 1806, when a verdict having passed for the plaintiff, a new trial was awarded. A second trial was had before TILGHMAN, Chief Justice, on the 1st October 1807, when the jury found for the defendant, and a motion for a new trial was overruled ; whereupon this appeal was brought.

The chief justice reported the evidence produced on the trial to the following effect.

David M'Nary came upon the lands in question, in the summer of 1796, and erected a cabin thereon. In the fall of that year, he resided in the cabin, made rails, and sowed $\frac{1}{4}$ acre with rye. In the spring of 1797 he carried out provisions to make a

permanent residence, had his axe, plough, farming and house-hold utensils about him, lived in the cabin, cleared 8 acres of which 3 acres were planted with corn, and in the fall of that year he sowed more grain, and was seen living in his cabin, which contained his bedding and cooking utensils. In 1798, he rolled logs, continued his improvements, eat and slept in his cabin, planted corn, reaped his fall grain and put in a new crop. On the 5th February 1799, M'Nary leased this land to John Maybury, senr. together with the grain in the ground, and the turnips and the potatoes in the cabin for 3 years; upon condition of his clearing more land, keeping up the possession, and sowing down 15 acres the third year, of which the landlord was to receive ⅓ part. In the same month, the defendant being about 18 years old, came out before his father, and resided on the land, in the cabin; he added to the clearing, made more rails, and raised spring and fall grain every year, during the continuance of the lease. He, his brother Robert, or aunt Sarah, generally slept in the cabin until November 1801.

Old John Maybury having taken a lease of an adjoining tract, removed the bed from the old cabin and converted it into a cooper's shop where he sometimes worked. About this period, the defendant courted a young woman in the neighborhood, with whom he intermarried on the 2d February 1802, and shortly after removed with his wife into the cabin on the land.

*535] *During the interval of courtship, he continued to work on the land, generally sleeping at his father's and occasionally at other places.

On the 7th February 1802, the lessor of the plaintiff erected a cabin on the lands in dispute 30 perches distant from the old one, wherein there was bacon hanging, but no bedding or bed, or cooking utensils. On the 10th of the same month, he obtained a survey of 400 acres which included the defendant's cabins and 9 or 10 acres of his cleared land. The new cabin being discovered not to be within the lines of the survey, was removed within the lines. M'Laughlin had his bed and bed-clothes, and other little necessaries about him, with some corn and meal. He deadened ½ acre of land, made one tree into rails, and worked at jobs in the neighbourhood; but on Saturday nights, returned to his cabin and slept therein to keep up his residence. He brought his ejectment against the defendant on the 20th May 1792.

The chief justice expressed his entire satisfaction with the verdict.

Messrs. S. B. and A. W. Foster, now argued in support of the appeal.

If the lessor of the plaintiff has proved a legal settlement, he is entitled to recover unless a better adverse right has been shewn. It is of no moment, what was the quantity or extent of the defendant's improvements, if unaccompanied by personal residence. Such residence is the *sine qua non* of a settlement.

[M'Laughlin's Lessee v. Maybury.]

4 Dall. 366.    The act of 30th December 1786, defines what shall be deemed a settlement, and is explanatory of the act of 3d April 1792.    Of the unequivocal intention of M'Laughlin to make an immediate settlement, there can be no doubt.    All his acts shew it.    What his motives were for fixing on this land as his place of residence, or how far his improvements had progressed, when he commenced this suit, are foreign to the question of right, if the defendant has forfeited his pretensions thereto.    The hardship of a particular case cannot alter the law; it is well known, that many valuable improvements of the possessors have been swept away by verdicts, sanctioned by the judgments of courts.    This court can take notice of no other equity, than such as is sanctioned by the law.

The defendant was a minor, and came upon the land under the lease made to his father.    He worked it under his immediate direction.    His residence on the land in 1800 and 1801 was deceptive of the law.    He often resided and eat at his father's in those years; but from November 1801, until February following, there was not the slightest personal residence on the land. The cabin, instead of being the habitation of man, was changed *into a cooper's shop, and the bed removed therefrom.    [*536 It afterwards became a smokehouse.    Possession and claim are distinct things; the former must be accompanied by extrinsic acts; but in the present instance, what would not be deemed the commencement of a settlement is urged as the completion of one.    An uniform series of decisions have ascertained the necessity of keeping up a continued residence; if these are broke through, we shall be altogether at sea.    The absence of actual settlers from their farms should be rigidly accounted for; mere convenience will not justify the relinquishing of their personal residence; and it is obvious, that such persons in 1801 and 1802 cannot reasonably expect the same indulgence, as those who settled immediately after the Indian hostilities had ceased. It is submitted, that the present verdict is against law and the weight of evidence.

Messrs. Semple and Baldwin for the defendant.    It is admitted, that this court will do what the Circuit Court ought to have done; but it cannot be denied on the other hand, that the claim of the lessor of the plaintiff is a harsh one, and not to be favoured, as it tends to despoil the landlord and his tenant of the fruits of their honest labours.    The present appeal is made to the discretion of this court; and on motions for new trials, mere technical rules of law will not be the *criteria* by which they will judge.    The party applying must have merits to entitle him to a re-hearing.

It appears by the report of the evidence, that Mr. M'Nary having built his cabin in the summer of 1796, came to reside therein that fall, and continued such residence, as far as the circumstances of the country would permit, up to February 1799,

[M'Laughlin's Lessee *v.* Maybury.]

when he leased to old Maybury.   During this interval, he cleared land and put in regular crops.   The defendant under his father succeeded to him, and either he, his brother, or aunt, slept in the cabin until November 1801.   During this time also he made additional improvements, and regularly put in his spring and fall crops, having more than 10 acres of land cleared and under fence ; so that here was a complete settlement and residence for five years.   It is true, that the defendant, a young and unmarried man, might occasionally have slept at his father's or some neighbour's during the period of two years and nine months ; and that being attached to a young woman, he pursued his matrimonial scheme between two and three months afterwards, until his endeavours were crowned with success.   He then returned to his cabin with his wife, which, while not occupied by him as a sleeping place, was made use of by his father for other purposes.   Who is there so rigid as not to make allowances to youth under such circumstances ?

*537]

The plaintiff's counsel have laboured hard to keep the improvements of their client out of view.   Slight indeed must they be deemed, when set in opposition to five years unremitted toil. At this moment it cannot be ascertained, that the verdict of the jury was not founded on a defect of settlement by the lessor of the plaintiff, without even judging of the defendant's title.   But whatever considerations may have influenced the minds of the jurors, their verdict was just and honest, and must give pleasure to every feeling heart.   It has met the full approbation of the chief justice who tried the cause ; and unless it shall appear clearly to this court to violate settled rules of property, or flatly be repugnant to evidence, we trust it will not be disturbed.

YEATES, J. stated the case, and the general outlines of the evidence, as detailed by the chief justice.   He then added :

I do not descend to a more minute detail of the evidence, as the title of the actual settler does not depend on the extent of his improvements, but on his improvement *animo residendi,* and continued from time to time under existing circumstances.

It has been pronounced from this bench during the present term, that this court on an appeal, are bound to do what the judge ought to have done in the Circuit Court.   And if such a case has been made as requires the exercise of the controuling powers of this court by settled law, we are as much compelled to discharge our duty in this particular, as in any other of the branches of our official duties.   It is an application to the sound legal discretion of the court, bottomed on the immutable principles of justice.   To succeed in a motion for a new trial, the party applying must have merits.

It is a dispute between two persons claiming as actual settlers, under the act of 3d April 1792, without warrants.   The jury were told by the chief justice on the trial, that the question between the parties turned on a single point, whether the actual

[M'Laughlin's Lessee *v.* Maybury.]

settlement of the defendant was kept up till that part of 1801, which would make five years from the commencement of the improvement.   An unmarried man in particular is not obliged to remain always on his land : he may make visits to other places ; and especially, if his father lives near him, he would naturally spend a good deal of his time with him, without being supposed to abandon his settlement.   A man cannot be an actual settler on two tracts of land ; but if he has children of sufficient age to reside on and cultivate the lands, those children might obtain a tract of land by settlement ; and where a settlement has been fairly commenced, and valuable improvements made, great *allowances should be made in point of resi- [*538 dence, unless it appears, that it was done with a fraudulent intention of effecting two residences, in order to hold two tracts.   To the truth of these remarks every honest man will subscribe.   I deplore the unfortunate error which has prevailed among actual settlers, that where one of them has left his habitation for temporary purposes, though he has given the most unequivocal proof of his intention to return speedily, another may invade his cabin and hold the land in opposition to him. Such conduct cannot be justified by religion, morality, or the act of 3d April 1792.   The legislature never intended that an actual settler should be confined to the lines of his survey, as within the four walls of a prison.   Their views as to them were much more beneficent.

This case was submitted fairly to the jury, that if they should be clearly of opinion, that the residence had been relinquished, the plaintiff's title was good.   But if they had any doubts on that point, they ought to find for the defendant ; because it was a very hard attempt on the part of the plaintiff to reap the fruits of another's labours.

The jury by their verdict have negatived the abandonment of the residence.   They were the exclusive judges of the credit of the witnesses.   Few persons will say, that the defendant's marriage in February 1802, was not a tolerable excuse for quitting his old cabin.   The judge, who tried the cause, has declared his satisfaction with the verdict, and thinks it a good one.   His opportunities of information of the witnesses, are much superior to those who were not present at it, and his opinion of the evidence will always have great weight in this court.   On the fullest consideration, I cannot say that the verdict which has been given, is either against law or the weight of the evidence ; and therefore I am of opinion, that the judgment of the Circuit Court should be affirmed.

SMITH, J. concurred.   He had perused the opinion which had been delivered, and fully approved of it.

BRACKENRIDGE, J.   I have been led to consider a little the origin and nature of granting new trials.   It succeeded the writ of

[M'Laughlin's Lessee v. Maybury.]

attaint.   This writ was grounded on an allegation of perjury ;*
*and this allegation was founded on express proof, or on
*539]  a presumption of corruption in the jury by the party.
Hence at common law, where the writ must be against the whole
jury, the defendants could not have been fewer than thirteen.
This appears from the recital in the stat. 15 Hen. 6.

The presumption of corruption in the jury by the party, where
it was matter of presumption, and not of express proof, must
have been drawn from the glaring injustice of the verdict.   That
it must have been a case of manifest wrong, will appear from
the greatness of the punishment on conviction.   This wrong
could more easily appear, when the matter in issue to the jury,
was simple, as at an early period it was in all cases.   As ques-
tions became more complicated, the wrong could not always so
manifestly appear ;  and hence the presumption of corruption did
not so necessarily arise.   The punishment of course became dis-
proportioned to the evidence ;  conviction did not follow, and the
attaint ceased to be a remedy.   It was attempted to be helped
out by statute reducing the punishment ;  yet reciting in all cases,
the reason and ground of the writ, to be that of corruption by
the party, and perjury in the jurors.   But the questions submit-

* Stat. Westm. 1.   3 Ed. 1, c. 38.   An attaint shall be granted in a plea of land.

For as much as certain people of this realm doubt very little to make a false oath,
which they ought not to do, whereby much people are disinherited and lose their
right, it is provided, that the king of his office, shall from henceforth grant attaints
upon inquests in plea of land, or of freehold, or of anything touching freehold, when
it shall seem to him necessary.

This statute is in affirmance of the common law.   2 Inst. 235.   But though an
attaint did lie upon a false verdict before this, yet because in plea real, the remedy
is of a higher nature, the king sometimes refused to grant it.

Brief of conviction old name for writ of attaint.   Stat. of Marl. c. 14.

The witnesses named in the deed, should be joined with the inquest.   But if they
or any of their own head will say, that it is disseisin, their verdict shall be admitted
at their own peril.

13 Ed. 1, c. 30.   That the justices assigned to take assises, shall not compel the
jurors to say precisely, whether it be disseisin or not; so that they do shew the
truth of the deed, and require aid of the justices.

By stat. 14 Ed. 2.   Distress is given in case of default of jury of attaint to bring
them.

1 Ed. 3, c. 6.   It is provided, that for the great mischiefs, damage and destruc-
tion that hath happened to divers persons, by the false oaths of jurors, in writ of
trespass, from henceforth writ of attaint shall be granted, as well upon the princi-
pal as upon the damages; and the chancellor shall grant without speaking to the
king.

34 Ed. 3, c. 7.   Here it is awarded against the falsehood of jurors, to the poor
without fine.

9 Rich. 2, c. 3.   Attaint given under a false oath, and also writ of error on the
judgment.

11 Hen. 6.   Complaint of the great damage and disherison, that cometh by the
usual perjuries of jurors, the which perjury doth abound and increase more than
it was wont, for the great gifts that such jurors take of the parties, &c. costs and
damages given on conviction.

15 Hen. 6.   Great perjury which horribly continueth, &c.

11 Hen. 7, c. 21.   Whereas perjury is much and customary used among such per-
sons as pass upon issues, &c.

23 Hen. 8, c. 3.   Attaint granted against the petit jury, giving an untrue verdict
and each to be fined 20l. one half to the king, and the other half to the party who
sueth; and fine and ransom at the discretion of the justices, afore whom the false
sacrament shall be made.

ted *to a jury becoming every day still more complicated in evi-
dence, and intricate in law, from the removal of restraints in
the alienation of real estate, or from the relations and trans-
actions of a more improved state of society, the unreasonable-
ness continued more and more to be felt, of considering that
as a crime, which might be no more than a mistake. The
writ of attaint, with all the softening of statutes in the penal
consequences of conviction, ceased to be a remedy; for no con-
viction would follow. The feelings of the heart and the reason
of mankind revolted against it. It is now a mere name; and
the inference of perjury has ceased to be drawn even in a case
of glaring injustice; because defect of intellect or of attention
in the course of a long examination, or preconceived and imper-
ceptible bias may be sufficient to account for it: and I take no-
tice of this early mode of questioning the verdict of the jury,
only with a view to shew, that originally it could not be ques-
tioned upon slight grounds.

In place of the writ of attaint, which was now disused, re-
course would seem to have been had in extreme cases, to the
Court of Chancery; where under a consideration of the circum
stances of the case, new trials were directed.

This led to the courts of law themselves entertaining motions
for new trials. Motions of this nature had always been enter-
tained on the ground of misbehaviour of the jurors or parties,
or irregularity in the finding, or delivery of the verdict; and the
reason why we do not hear more of these motions, at an early
period, is, because "the old report books do not give any ac-
"counts of the determinations, made by the court upon mo-
"tion." 1 Burr. 394.

In Slade's case, Style 138, which is our first case on the sub-
ject of granting new trials, it was moved, that judgment be stay-
ed upon a certificate of the judge, that the verdict had passed
against his opinion, and that there might be a new trial; for
that it had been done theretofore in like cases. But ROLLE, C.
J. of B. R. said, "that it ought not to be stayed, though it had
"been done in the Common Pleas; for that it was too arbitrary
"for them to do it."

Nevertheless, (though at first with great strictness) the prac-
tice of Common Pleas would seem to have prevailed: and of late
years, says Lord MANSFIELD (1 Burr. 395) the courts of law
have gone more liberally into the granting new trials; and not
only after trials at Nisi Prius, but also after trials at bar, as read-
ily as after trials at Nisi Prius; or indeed rather more so, as
the latter must be done upon what could have actually and per-
sonally appeared to a single judge only; whereas the former is
grounded upon what must have manifestly and fully appeared
to the whole court. As a reason for granting new trials, he
further observes, that as most general verdicts include legal
consequences, as well as propositions of fact, in drawing these

[M'Laughlin's Lessee *v.* Maybury.]

*consequences, the jury may mistake, and infer directly contrary to law.

　This was the beginning of his doctrine, which led to the making propositions of fact in some cases legal consequences; and finally, to the exclusion of the jury in some instances, from the province of drawing legal consequences at all. I impute it to his introduction, that in subsequent practice, more liberty hath been taken with verdicts of juries, than it would seem to me, principle would warrant. It became fashionable to alledge, and indeed tracts (as Eunomus, &c.) have been written to prove, that the juries were in no case judges of the law; that if they did determine the law, it was because on a general issue, it was incidental to the finding the fact, and involved with it, that the courts had not only discretionary power, but were bound to controul the juries in their verdicts; that if the juries were to give an hundred verdicts against what the judges took to be law, new trials should be granted; for juries ought not to be considered as having a concurrent right to judge of law, but as directed by the court; and that the direction of the court was the only evidence they could have of law, the only speculum through which they could look at it.

　On this I observe, that in every general verdict two things must be involved; the fact and the conclusion from the fact; hence it cannot but be, that the jury are judges of the law. Whence then the maxim *ad questionem juris* &c. ? * The maxim

*542]　*means, that where the conclusion can be separated from the fact, it shall be drawn by the court. This can be

---

* That *decantatum* in our books, (as my Lord VAUGHAN calls it) *ad questionem facti* &c. &c. is true. For if it be demanded, what is the fact? The judge cannot answer it. If it be asked, what the law is in that case? The jury cannot answer it. But upon the general issue, if the jury be asked the question, guilty or not? which includes the law; they resolve both law and fact in answering guilty or not guilty. So as, though they answer not singly to the question, what is the law, yet they determine the law in all matters where issue is joined and tried, but where the verdict is special. But in such cases, the judge of himself cannot answer or determine on the particular of the fact, but must leave it to the jury, with whom let it rest and continue for ever, as the best kind of trial in the world for finding out the truth, and the greatest safety of the just prerogatives of the crown, and the just liberties of the subject; and he who desires more for either of them, is an enemy to both. If the court might charge the jury to find for the defendant, though the jury will generally respect the sentiments of the court on points of law, they are not bound to deliver a verdict conformably to them. *Per* IREDELL, J. 3 Dall. 33.

It is the peculiar and exclusive province of the jury to infer facts from the evidence. *Per* CUSHING, J. Ib.

On questions of fact, it is the province of the jury; on questions of law, it is the province of the court to decide. But it must be observed, that by the same law, which recognizes this reasonable distribution of jurisdiction, the jury have nevertheless a right to take upon themselves to judge upon both, and to determine the law as well as the fact in controversy. On this and on every other occasion however, we have no doubt you will pay that respect which is due to the opinion of the court; for as on the one hand, it is presumed that juries are the best judges of fact, it is on the other hand presumed, that the court are the best judges of law; but still both objects are lawfully within the jury's power of decision. 3 Dal. 4. *Per* JAY, C. J. in Supreme Court of the United States.

Can it then be the right of the court to set aside a verdict indefinitely? It will be to say, you may determine the law, but your determining is nothing. Yet this must be the result of the doctrine of an arbitrary power in the court to set aside a verdict, on the ground of being against law.

o

[M'Laughlin's Lessee *v.* Maybury.]

done only by the pleadings, in the course of which the facts are admitted, and the conclusion alone remains to be drawn.

In drawing the conclusion, the mind thinks of some general principle under which the fact may come ; and in this operation of the mind, the court must necessarily travel into the fact, from which the conclusion is drawn. They cannot, but in the first instance, make an inference from the evidence, of what the fact in the case is. It does not follow therefore, that it is only matter of law of which the courts judge in granting a new trial. In every case on a general verdict, they must judge of the fact first.* Hence the imperfection of their judgment, in judging of the justice of their verdict ; and it follows, that they are not bound and cannot be justified in granting new trials, against the sense of successive verdicts.

Where a mind has the faculty of reasoning, and that faculty is strengthened by the exercise of reasoning, as is presumed to be the case with a judge, great power is acquired in separating and comparing ideas ; and where a knowledge of general rules enable to determine under what rule the facts of a case come, we approach the nearer to something like certainty ; yet such is the diversity of transactions, that the application of a general rule in all cases would work injustice.† How then can a judge know or undertake to say with certainty, that when a jury departs from what he could call a general rule, there is not something in the nature of an exception in the case, which attaches the feelings of the heart and forces a verdict contrary to the direction of the *court, who apply the general rule. For this reason, the verdict of a jury ought not lightly to be questioned, even [*543 though it has gone against the opinion of a judge.

It is with less confidence, that a court ought to advance, in granting a new trial, on the ground of a verdict being against evidence. And one reason for this (which can never be answered) is, that the judge cannot fully know upon what evidence, for they may have other evidence than what is shewed in court, Tri. *Per* Pais. 274. The impressions of a jury of what themselves know of the parties or witnesses, or what is collected from the manner in which the testimony is given, cannot be communicated, and makes no part of the evidence before the judge. To say therefore, in the language of Judge FOSTER, (1 Burr. 395,) "that the evidence greatly preponderates against the ver-"dict," is a matter, which in no common case can be done. I am therefore not disposed to think that in every case, "where

*Also in such case where the inquest may give their verdict at large, if they will take upon them the knowledge of the law upon the matter, they may give their verdict generally, as is put in their charge ; as in the case aforesaid they may well say that the lessor did not disseise the lessee, if they will, &c. Lit. § 368.

† There is an excess of discrimination in investigating the qualities of things, which in legal as well as other objects of critical disquisition, tends only to draw out a question to infinity. That the foundation of every rule must of necessity be imperfect, and that it is impossible to bound the scope of its application to a mathematical point. Rob. on Frauds cites 2 Atky. 41, 42.

there is a reasonable doubt," (which is the expression of Lord MANSFIELD) we are justifiable in setting aside a verdict.

The granting a new trial must involve the idea, that the court so exercising the power, have the evidence all before them, from which the fact was inferred by the jury. Unless therefore in the case of a judge, before whom the evidence was given, there cannot be the same evidence that was given to the jury. For though the whole be taken down by the notes of the judge, *lite-ratim* as to written evidence, and *verbatim* as to oral testimony, yet the impression cannot be communicated. For as much may be frequently collected from the manner in which the evidence is delivered, as from the matter of it. 3 Black. 375.

The law's delay is proverbial; it is enumerated by the poet amongst the evils of life. It furnishes an argument against turn-ing the successful party round to another trial. Nor is it him that it delays only, but other suitors. There is greater delay in this state from granting new trials, than under the judiciary system of that country from whence we derive the practice. There the four terms occur every year, to which the motion for a new trial can be made; and the cause may go to trial at the sittings after term, or at a Nisi Prius court, allowing only rea-sonable time for the commission to issue and the jury to be sum-moned, and the new verdict may be had in three months. Here, so far as respects the Nisi Prius, the delay of a new trial ordered at March term, must be until December, and in all the Circuit Courts it cannot be less than a year; so that the delay of judg-ment and execution, independent of the merits, is of itself an objection for a motion for a new trial. Hence it is, that in the Circuit Courts, the motion for a new trial, where the verdict is for the plaintiff, is a thing of course, an appeal being given *from the judge refusing a new trial, and the delay of course obtained. It being thus a thing contemplated by the judge before whom the cause comes to be tried, that a mo-tion for a new trial will be made, he is led to delay the trial by taking down the written evidence at great length, and " to chroni-" cle the small beer" of the testimony, endeavouring to reach the whole body of the evidence, so that the time allotted for the circuit is sometimes taken up with little more than a single cause; and when a new trial is granted, the judge who comes the next year has the same cause to occupy his chirography, and prepare for the motion that is to be made again. This may be said to be in some degree the fault of the system; but the court must take the system as it is, and in matters of practice must look to it; and the reason *ab inconvenienti* must weigh with them in all that is within the province of discretion. Our legal discretion must have respect to the rights of other parties, who are waiting on the country for the hearing of their claims. And at a time when the cry of delay is loud against the administration of jus-tice, it would seem to me, that it is our duty to consult dispatch in the trials, and to refuse, unless in extreme cases, the throw-

*544]

ing the matter back upon another jury. The public sentiment, as far as I can collect it, is with the juries ; and we hear less of the injustice of verdicts than of the delay of trials. If a more sparing interference of the courts should not be exercised, it may come to be felt by the people, and lead to a reform in a system which does not give time for those revisions of verdicts which the constitution and holding of the English courts admit. Is it a time for the courts of this country to be stretching to the utmost extent the controul of verdicts, when the struggle is, whether there shall be law judges at all ? Rules of law are to be regarded as much as the principles of any other science ; but a great part of these rules which we call law are but the dictates of natural feeling, or moral reason applied to the case before us ; principles of equity and justice, resulting from the relations or contracts of men. The judge, in the plenitude of his pride, is apt to arrogate to himself, as having alone the capacity to judge of these, or to apply them, which is but the exercise of reason. A consideration of these particulars ought to give respect for the deductions of even uneducated men, sc as not lightly to set aside what they have thought the justice of the case.

A knowledge of rules is the result of reading or of hearing, but the application of them requires a different faculty, and which we denominate common sense. Now it is allowed on all hands, that a man may have at least the reputation of a great judge, and yet be deficient in the knowledge of human nature *and in natural understanding. It is the province of a court to assist with the knowledge of rules, and of a jury [*545 to assist in the application of them. This gives a jury a wider field than the mere finding of a fact, even supposing them excluded from determining what the law is. The sense of a jury in the application of law to the fact is a great help to the court, and a great support. *Consilium simul atque auctoritas adsunt.* * Tacit. de Mor. Germ. A passage, which expresses the use, and perhaps the origin of juries.

I never find the verdict in agreement with my way of thinking as to the justice of the case, but I draw from it strong confirmation of my opinion ; nor ever find it against it, but I go a great way in taking it for granted that I was wrong. And with good reason ; for it has been rare, that I have not observed in the jury all due deference to the judgment of the court ; and it must be a strong sense of right and wrong that will lead them to dissent. It is this experience, and this course of thought, that has given me some resistancy to applications for new trials.

It has been perhaps increased by the time taken up in arguing them, and the making them in the Circuit Court mere matters of course ; so that every cause must be tried with a view to a new trial ; and the judge is more concerned to get the evidence

---

* *Eliguntur in iisdem consiliis, et principes qui jura per pagos vicesque reddunt. Consilium simul atque auctoritas adsunt.*

forward to the hearing in term, than to infer from it in the first instance.

So much with respect to the province of the jury in determining the law, and the province of the court in controuling their conclusions in matter of law by setting aside a verdict. But in matter of fact, the conclusion of a jury is still more to be respected. I will not say, that it is exclusively their province, but it is peculiarly their province, and not lightly to be invaded. It must be a strong case, such as to shock the mind, that would make me easy in throwing the parties upon the country for a new trial, where there has been no surprise, a full hearing, the advantage of learned advocates, &c. but where the motion is made merely on the ground that the verdict is against evidence. But where the judge who had tried the cause, and before whom the verdict was taken, has sanctioned it with his judgment, and now declares himself satisfied with it, as at present advised, I am nearly prepared to say, that to interfere, is a power which I will not undertake to exercise. At least, I am prepared to express a wish, that the legislature will interfere and take away the appeal in such cases from the Circuit Court altogether, to prevent delay that must be done, or the system must be changed.

*546] \*Having made these summary observations, I shall now consider in a few words, the case before the court. It may be said to involve a question of law, for that an actual settlement is necessary to support the claim of the plaintiff, or to protect the defendant, is matter of law ; and it may be, that what shall be construed an actual settlement, may be considered as matter of law. But this consideration, in the nature of the thing, is so involved with the conclusion to be drawn from the facts, that it amounts to the same thing ; for the question will be, whether the facts of the case constitute an actual settlement. The legal conclusions, and the conclusions from the evidence cannot be separated. The verdict can therefore be considered only on the ground of being against evidence. Here then was the conclusion of a jury, and the sanction of the judge before whom the cause was tried ; and what weighs still more with me, that judge after reflection, and a lapse of time, declaring himself satisfied with the verdict. I shall therefore not be disposed to disturb it ; but to concur in refusing a new trial.

Judgment of the Circuit Court affirmed.

Cited in 1 Watts 51 to show that the title of a settler does not depend on the extent of his improvements, but on the *animo residendi* and the possession continued. Cited for the same purpose in 5 W. & S. 301.

Cited in 1 Pa. 349 to show that a man cannot be a settler at the same time on two tracts.